## Case No. 15,431.

### UNITED STATES v. HUTCHINSON.

[1 Hask. 146.] [1]

District Court, D. Maine.　March, 1868.

SHIPPING—OMISSIONS FROM MANIFEST—LIABILITY OF MASTER—REMISSION OF PENALTIES—PLEADING—VARIANCE.

1. The master of a vessel, for importing goods without a manifest, is liable to the penalty imposed by section 24 of the act of 1799 [1 Stat. 646], even though he may not have known that the goods were on board.

2. He is liable for the penalty when the goods have been brought on board by one of the crew secretly, and are concealed by him.

3. He is not entitled to the proviso in the act, if the goods are unshipped.

4. Throwing goods into the dock, protected so that they may be reclaimed, is unshipment.

5. The secretary of the treasury may remit penalties in such cases.

6. A declaration, alleging the goods imported to belong to the master, and to have been consigned to him, is not supported by evidence that they belonged to and were smuggled on board the vessel by one of the crew.

7. Such variance is fatal to a verdict against the master.

Debt by the United States against [James H. Hutchinson] the master of an American vessel, to recover under section 24 of the act of 1799 a penalty for importing goods without a proper manifest, the penalty being equal to the value of the goods so imported. The action was tried upon the plea of nil debit, and a verdict was rendered for the United States. The defendant moved for a new trial for misdirection in matter of law.

George F. Talbot, U. S. Dist. Atty.

Almon A. Strout and George F. Shepley, for defendant.

FOX, District Judge. This is an action of debt, brought to recover the value of certain goods, wares and merchandise, viz: 2,300 cigars, three demijohns of rum, and two bottles of gin, brought into this port in the barque Sarah B. Hale from Cardenas, of which barque the defendant was master, the same not being on the manifest. The 24th section of the act of 1799, on which this action is founded, enacts that "if any goods, wares and merchandise, shall be imported or brought into the United States, in any ship or vessel whatever, belonging in the whole or in part to a citizen or citizens, inhabitant or inhabitants of the United States, from any foreign port or place without having a manifest or manifests on board agreeably to the directions in the foregoing section, or which shall not be included or described therein, or shall not agree therewith, in every such case, the master or other person, having charge or command of such ship or vessel, shall forfeit and pay a sum of money equal to the value of such goods not included in the manifest or manifests; and all such mer-

chandise not included in the manifest, belonging or consigned to the master, mate, officers or crew of such ship or vessel, shall be forfeited. "Provided always, that if it shall be made to appear to the satisfaction of the collector, naval officer, and surveyor, or to the major part of them, where those officers are established at any port, or to the satisfaction of the collector alone, where either of the other of the said officers are not established, or to the satisfaction of the court in which a trial shall be had concerning such forfeiture, that no part of the cargo of such ship or vessel had been unshipped after it was taken on board, except such as shall have been particularly specified and accounted for in the report of the master, or other person having the charge or command of such ship or vessel, and that the manifests had been lost or mislaid without fraud or collusion, or that the same was or were defaced by accident, or incorrect by mistake, in every such case the forfeiture shall not be incurred."

The articles in question were brought in the Sarah B. Hale, a vessel belonging to citizens of Portland, from Cardenas. The goods were the property of the second mate, and were put on board the vessel by him secretly, not only without the knowledge of defendant, but against express orders and directions given by him to the officers and crew as to their bringing on board any articles to be smuggled into this country. The captain did not know that the goods were on board, and they were not entered on the manifest. One evening, after the stevedores had left off discharging and whilst the inspector was on board, the second mate, having stowed a portion of the cigars in a canvas bag, threw them into the dock, from which they were soon after fished up by the inspector, a small portion only of the cigars being injured by the water. A verdict was rendered for the government, and the defendant now moves for a second trial, for alleged misdirection by the judge, who instructed the jury "that the master would be liable in this action, if the other facts, which were required to make out the case, were established, even if he had no knowledge of the goods being placed on board the vessel of which he was master, or if they were placed there clandestinely by the mates or crew without his assent, or any intent on his part to so import them; that in order for the defendant to avail himself of the benefit of the proviso in the 24th section, he must show that none of the goods not contained on the manifest had been unshipped; that it would not be sufficient for the master to show that his manifest was incorrect by mistake, if the jury should find that any part of the cargo, other than that specifically accounted for in the report of the master or other person having charge or command of such ship or vessel, had been unshipped."

The defendant contends that a master is not

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

liable to this penalty, when the goods were concealed on board by third persons without the knowledge of the master, and without negligence on his part; that he is excused, if the goods were brought on board without his knowledge, and he has been diligent to prevent their being so on board.

The answer to this construction of the statute is, that no such excuse is found in the act; the language is absolute, prohibitory, and there is not a syllable that hints at any such limitation of the master's liability, and which is to relieve him from accountability if he can establish the fact that the goods were on board without his privity or consent, and without negligence. The language of the act is most positive and unlimited. If goods not on the manifest are brought into the United States, the master shall forfeit the value of such goods unless he is protected by the proviso. I adopt the doctrine as laid down in the case of The Industry [Case No. 7,028]. "We are undoubtedly bound to construe penal statutes strictly, and not to extend them beyond their obvious meaning by strained inferences; on the other hand, we are bound to interpret them according to the manifest import of the words, and to hold all cases, which are within the words and the mischiefs, to be within the remedial influence of the statute." See, also, U. S. v. Winn [Id. 16,740].

The master is made absolutely liable by the very words of the section, and how can a court be justified in restricting this liability to certain cases, qualifying it so as to reach the master only, when he has not been personally concerned in the violation of the law, or has endeavored to prevent it.

If we consider for a moment, the relation which the master of the ship bears to the vessel and her crew, no one will hesitate as to the correctness of the construction which was given at the trial to this section of the statute. The vessel is under the entire control of the master; he employs the crew, and they are answerable to him for all damages he may sustain by their doing an act prohibited by law; all of the other officers and the crew are the direct servants of the master in different grades of authority; the relation of master and servant therefore exists between the captain and his crew, and he becomes accountable for their actions. As laid down in Schieffelin v. Harvey, 6 Johns. 177, the master is responsible for any injury that might have been prevented by human foresight or care; he is liable for goods stolen or embezzled on board the ship by the crew or any other persons, although no personal fault or negligence may be imputed to him, because he is bound for the personal fidelity of all his servants, and this rigor of the law arises from public policy, in order to prevent the combinations that might be made with thieves and robbers. In that case it was said the goods were stolen by some of the customs officers in England, and the court says:

"It was the duty of the master to guard against such accidents as theft" by customhouse-officers, "and if he has neglected to do it or been so unfortunate as not to detect the theft, he and not the shipper must bear the loss; this was one of the risks which he agreed to assume. The master was left in full possession of the ship, and his control over her and her cargo * * * was complete."

This was the liability of the master as a common carrier by general principles of law, and not so declared by any statute. It exhibits the responsibility the master is under to the owners of goods in his charge, makes him a guarantor for the honesty and fidelity of all under him, and if this is not considered unjust and unreasonable in relation to his duties and liabilities to individuals, it certainly cannot be deemed unjust to hold him alike responsible to the government, and to a like extent for the honesty and fidelity of his crew, and for their not violating the laws of his own country.

In my opinion the object and intent of congress was, to make the master a surety for the fair and upright conduct of all on board under his orders and control. Without connivance on his part, goods to any considerable amount could hardly be smuggled from the ship, and the strong inducement to watchfulness, to integrity and prompt interdiction of illegal traffic, would be wholly lost upon the construction of this act claimed by the defendant. The law did not intend to allow the master in his defence to be heard to aver his ignorance of the goods and merchandise brought in his ship; it makes it his duty to know; and he is not to be excused by saying he did not know such articles were on board, as Sir William Scott remarks in The Hoop, 1 C. Rob. Adm. 220: "The intention of the parties might be perfectly innocent, but there is still the fact against them, of the actual contravention of the law, which no innocence of intention can do away." The law has prohibited the act, and it is immaterial whether the party supposes it to be an offence or not. The penalty attaches for its violation.

A careful examination of other sections of the act now under consideration will leave no doubt in the mind of any one as to the intention of congress, and the correct interpretation of the 24th section. In various sections, it will be found that congress has imposed upon the master or other person in charge of the ship or vessel duties and responsibilities of a personal nature in connection with the employment of the ship or vessel, and from the penalties of which, in case of their infraction, he is not relieved by reason of his own faithfulness and diligence. The act makes him a surety and guarantor to the government in these cases of the fidelity of his crew and all others employed about the vessel, and if there is any infringement, holds him personally accountable therefor.

By the 50th section, it is enacted that no goods, wares or merchandise, brought in any vessel from any foreign port, shall be unladen therefrom but in open day, except by special license, nor at any time without a permit, and if any such goods shall be unladen contrary to the direction of the act, the master or other person having the charge, and every other person, who shall knowingly be concerned therein, shall forfeit and pay the sum of $400.

By the 54th section, officers of the customs may board ships in port, or at sea within four leagues of the coast, and may seal boxes, chests, &c., found on board separate from the residue of the cargo, and if, upon arrival of the vessel at the port of entry, such boxes. chests, &c., are missing, or if the seals shall be broken, the master shall pay $200 for each box so missing, or the seals of which are broken. Will it be contended that the master would be exonerated from liability in an action for the penalty, by proof that one of the crew without his knowledge had sent on shore the box or chest, or had broken the seal upon it? No such excuse is found in the act, and it would savor of legislation to so construe it. It is not, in my view, in accordance with the intention of congress to thus exonerate the master from the liability so imposed upon him without limitation of any kind; on the contrary, the ship and all on board are under his command and control, and bound to obey him. It is a presumption of the act, that whatever is transacted on board his ship is with his knowledge and consent, and could have been prevented by him, if he chose so to do. He is therefore held personally accountable, and bound to see that all the requirements of the statute are fully complied with, and that there are no violations of any of its requirements. Any other construction would afford opportunities for the grossest frauds on the government, with but little chance for their discovery or prevention.

The same section (54) subjects the master or other person in command to a penalty of $500, if the customs locks are broken or removed after the vessel is in charge of an inspector, excepting in his presence, or if any of the goods or board are clandestinely landed. If these provisions and requirements are violated, the master is made absolutely liable for the penalty, and he would not be permitted to defend himself on the ground that the locks were broken, or the goods so landed in his absence by one of his crew, or a stranger, even, and without his privity and knowledge. The liability being imposed upon him by the statute, he is bound to take measures sufficient to prevent a violation of the law, not merely ordinary means, but such as will be sure to accomplish the purpose, otherwise he must abide the consequences.

By the 45th, 57th, and 60th sections of the act. penalties are imposed on the master for an infraction of these provisions, from which penalties faithfulness and diligence on his part would afford no relief, if the requirements of the sections are not complied with.

It is argued with great earnestness, that it is unjust thus to punish the master for an infraction of the law by others, which he was in no way concerned in, and to which he never gave his consent; but on the contrary, one answer to this objection has already been presented, and that is, the violation was committed by the servants of the defendant while in his employment, and therefore on general principles he should be held accountable; but this objection is one, which has been often addressed to the courts of the United States in revenue cases, but has never induced them to insert in a law a substantial requirement which it did not contain.

It was held in England in 1776, in case of Mitchell v. Torup, Parker, 227, that a ship, importing 221 lbs. of tea put on board in Norway by mariners on their own account without the privity of the master, mate or owners, was forfeited. The act of 12 Car. II. prohibited importation of such goods, excepting from place of growth or manufacture. Parker, C. B., in delivering his opinion says: "These words of the act are negative, absolute and prohibitory; they not only operate upon the goods, but equally the ship, and there is not a syllable that hints at the privity or consent of the master, mate, or owners. The reason of penning this clause in these strong terms is to prevent as much as possible its being evaded; for if the privity or consent of the master, mate or owners, had been made necessary to the forfeiture, it would have opened a door for perpetual evasion, and the provisions of this excellent act for the increase of the navigation would have been defeated. * * * It is objected that the penalty or forfeiture is only applicable to cases where there is some crime or guilt; but no crime or guilt can be imputed to the master, mate or owner, without their privity, the mariners being the only criminal or guilty persons, and therefore they ought to be the only sufferers. To which I answer, that though penalty or forfeiture, generally speaking, is the consequence of some crime or guilt, yet, neither penalty nor forfeiture necessarily imply the one or the other, though punishment always does."

By the same act, 12 Charles II., goods brought from British possessions in vessels which were not British owned, British built. or navigated by a British master with three-fourths of her crew British mariners were forfeited. In case of The Beaver, 1 Dod. 158, Sir William Scott, whilst he admitted such a regulation operated with great hardship on the owners of the goods, declared "that if the strongest possible case of ignorance were made out, it would not avail to protect the parties from the penalties imposed by the statute. * * * Cases of this kind therefore. though they may operate with great hardship upon innocent individ-

uals, yet, they are hardships which the legislature has thought fit to impose as necessary to maintain the great ends of the law."

In case of The Malek Adhel, 2 How. [43 U. S.] 210, which was a proceeding to obtain condemnation of the vessel for a piratical depredation by her crew, Mr. Justice Story, on page 233, says: "The next question is, whether the innocence of the owners can withdraw the ship from the penalty of the confiscation under the act of congress. Here again it may be remarked, that the act makes no exception whatsoever, whether the aggression be with or without the co-operation of the owners. * * It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel, in which, or by which, or by the master or crew thereof, a wrong or offence has been done, as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof. This doctrine also is familiarly applied to cases of smuggling and other misconduct under our revenue laws, and has been applied to other kindred cases. * * In short the acts of the master and crew, in cases of this sort, bind the interest of the owner of the ship, whether he be innocent or guilty; and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs." In the case of U. S. v. The Little Charles [Case No. 15,612], the same argument was upon that occasion addressed to Chief Justice Marshall. The learned judge in reply said, "It is a proceeding against the vessel for an offence committed by the vessel, which is no less an offence, and does not the less subject her to forfeiture, because it was committed without the authority and against the will of the owner. It is true that inanimate matter can commit no offence. But this body is animated and put in action by the crew, who are guided by the master. The vessel acts and speaks by the master."

It thus appears that in such a case an innocent owner is made to lose his property, his vessel, by reason of its misuse and illegal employment by his agents in charge. It is after all, holding the owner responsible through a forfeiture of his property for the misconduct of his servants and agents; and in like manner the master is made accountable pecuniarily under the 24th section of the act for the misconduct and illegal acts of his crew.

The general principle in relation to this class of cases is laid down in Smith's Master and Servant (page 145): "So also masters have been frequently held liable to informations for penalties, incurred by the breach of some statutory regulations by persons in their employ, although the masters themselves may have been perfectly ignorant that in that particular instance any breach of the law has been committed. These informations, it is true, do in strictness partake more of the nature of civil proceedings, to recover that which is a debt to the crown, than a criminal proceeding; but still, they are penal proceedings. Perhaps the most familiar instances of the master's liability to this kind of proceeding are to be found in cases of informations for breach of the revenue laws, in which cases, if a master were not held responsible for the acts of his servants, the revenue laws might, as was observed by Pollock, C. B., on a recent occasion, be evaded with the utmost facility and impunity, and they would be reduced to a mere dead letter."

At a meeting of influential merchants in London in A. D. 1851, a series of articles were agreed upon as a foundation of a proposed alteration in the customs laws. One of these articles was as follows: "Merchants, ship-owners and others, shall not be made responsible for the crimes or offences of their servants or crews, except where guilty knowledge, or the most culpable negligence is clearly traced home to them;" strong evidence certainly that the liability to which they were subject was of a much more absolute and stringent nature.

The respondent invokes a principle to be found in Peisch v. Ware, 4 Cranch [8 U. S.] 363, "that a forfeiture can only be applied to those cases in which the means that are prescribed for the prevention of the forfeiture may be employed." That case was one where goods were saved from a wreck, and a claim of forfeiture was made, because they were landed without a permit, and the court well says, that the application of this section of the law to require a permit before landing, and whilst the goods might be discharged before the permit could be procured, would be in fact preventing every attempt to save a cargo about to be lost on the coast. Such a case could never have been within the intent of the legislature, as the end would not be accomplished when the permit was procured. There would be no goods to land. The application of the principle as laid down in Peisch v. Ware, to the present case, is not quite so apparent to the court, as there can be no doubt that it was not an impossibility for the master to obtain accurate knowledge of all goods on board his vessel and enter the same on his manifest, and by so doing, of course, escape the penalty for those which were not thus entered.

Such being the construction of this section, how far is it modified by its proviso? What is its true meaning and effect? The language is: "Provided always, that, if it shall be made to appear to the satisfaction of the collector, etc., * * or to the satisfaction of the court, in which a trial shall be had concerning such forfeiture, that no part of the cargo of such ship or vessel had been unshipped after it was taken on board, except such as shall have been particularly specified and accounted for in the report of the

master, or other person having charge or command of such ship or vessel, and that the manifests had been lost or mislaid without fraud or collusion, or that the same was or were defaced by accident, or incorrect by mistake, in every such case the forfeiture aforesaid shall not be incurred."

To come within the proviso and escape the forfeiture, no goods not on the manifest must have been unshipped; if they are still on board, the government has a remedy for its duty; it can easily ascertain the precise amount it is entitled to by an examination of the article, and they remain as security for the payment; their being left on board is also strong proof of good faith, and of no intent to smuggle and defraud the government, whilst by their being unshipped, a contrary presumption would arise. I apprehend therefore, that if the goods have been unshipped, the forfeiture is incurred and inevitably follows, although the other conditions of the proviso may be proved to the entire satisfaction of the court.

Congress did not intend the master, after discharging the goods, should escape the forfeiture by showing that his manifest was lost, or mislaid, or incorrect by mistake or accident; but it required, that when the party claimed to have acted in good faith, and to be excused by reason of accident or mistake, the goods should remain on board to testify as to the alleged error or mistake. If the goods remain on board, the master may then show in excuse, that his manifest has been lost or mislaid without fraud or collusion, or if in existence, that it was defaced by accident, or incorrect by mistake. The counsel admit as I understand them, that if the manifest is lost or mislaid, the master cannot escape a forfeiture if the goods have been unshipped; but they claim that he may escape, if he produce the manifest and shows that it was defaced by accident or incorrect by mistake, although the goods have been unshipped; that the disjunctive "or" separates this clause from that portion of the paragraph respecting the unshipping, and constitutes the production of the erroneous manifest with proof of accident or mistake a sufficient protection.

No good reason is presented for such a construction. The one case is equally within the mischief as the other. The goods themselves are as necessary to show the nature and amount of the error in the manifest when produced, and whether the same was caused by accident or mistake, and also the true amount of duties to which the goods are liable, as when the manifest is wanting. If the goods are not within the control of the customs officers, but have been clandestinely landed, what proof in many instances could be presented upon which the court could decide as to the error in the manifest, its nature and extent, and whether intentional or accidental? For all practical purposes the goods themselves are as necessary in the case when the manifest is forthcoming, as when it is missing; and I cannot think that congress intended to establish any such distinction. In my view, it is not in accordance with a correct construction of the language employed, and is not called for by the purpose or spirit of the provision.

This construction of the proviso in question is sustained by the opinion of Mr. Justice Washington in U. S. v. Fairclough [Case No. 15,068]. That was an action of debt against a master of a foreign vessel, to recover for a violation of the 57th section of this same act a penalty of $500, for having on board a quantity of white lead more than was on the manifest. The lead had not been unladen. The proviso to section 57 was, that if it appeared that no part of the goods had been unshipped, except such as were contained in the manifest or report, and pursuant to permits, or that the said disagreement is by accident or mistake, the penalty shall not be inflicted. It was contended "that if the master gave satisfaction as to either of these matters it was sufficient, the disjunctive 'or' necessarily requiring that construction." Certainly such was the exact and literal language, and yet, Judge Washington after examining the 57th section, and comparing it with the 24th, the one now before us for construction, came to the conclusion that both were in pari materia, that there should be no incongruity between them, that it was the duty of the court to give a similar construction to each of them, and that under the 57th section the defendant, to claim the benefit of the proviso, must not only show that the goods were not unshipped, but further that the disagreement between the goods on board and the manifest was by mistake or accident.

Whether the goods had been unshipped was a question of fact for the jury. Their attention was called to the evidence with appropriate instructions bearing on the question, and I do not, on a careful review of the rulings at the trial, find any error on this point, or in the construction given to the 24th section and its proviso.

The argument, from the injustice and severity of holding a master responsible for a violation of the law by his crew, is stripped of much of its force, when we remember that the proviso to the 24th section will often afford him complete protection; if his manifest is lost or mislaid, or accidentally incorrect, and the goods have not been unshipped, he is released from liability. Certainly it is not exacting much of a master to have such care and oversight of his ship and cargo, as to prevent goods from leaving her before the duties are paid thereon. A very little extra time, a few more fastenings, could easily prevent anything of this sort.

If the goods have been unladen, so that the party can not derive protection from the proviso, he is still not wholly remediless and without relief; and I cannot do better on

this branch of the case than to adopt the language of Judge Livingston in case of U. S. v. Morris [Case No. 15,816].

The learned judge says, "A system of revenue laws must necessarily contain so many and such minute provisions, enforced by a corresponding number of penalties and forfeitures, as frequently to subject to difficulties the most upright and wary merchant, and expose his property to seizure and confiscation. That such cases must occur was early foreseen, and yet it was not thought proper to trust any court with the power of acquittal, founded solely on the innocence of the party. If the tribunal, having cognizance of the fact of forfeiture, might also have inquired into the quo animo, a sentence of confiscation would never have been pronounced if the innocence of the claimant had been made out. * * If the fact be made out, which by law produces a forfeiture, a court is bound to pronounce sentence accordingly.

"To have left the system here, would justly have exposed the American government to the charge of injustice in making no discrimination between the innocent and guilty. Provision therefore was made to rescue property which might innocently become liable to forfeiture from the penal sanctions of the law. By the 89th section of the collection act, the collector is enjoined to cause suits to be commenced for all penalties, and to prosecute them to effect." This law "requires of the court where the prosecution is depending to hear and determine the cause according to law; which can only mean, that if the fact which works a forfeiture be proved, the court must decide without reference to the innocence of the person to whom the forfeited article belongs.

"On the 3d of March, 1797, after the hardships and injustice of the existing system must have been felt, in leaving liable to sequestration property whose owner had been guilty of no willful neglect or fraud, congress for the first time conferred on the secretary of the treasury the power in question." This act "authorizes him in a mode therein prescribed to mitigate or remit altogether any fine, forfeiture, or penalty, or any part thereof, if in his opinion the same shall have been incurred, 'without willful negligence, or any intention of fraud on the person or persons incurring the same,' and to direct the prosecution, if any shall have been instituted for the recovery thereof to cease, and be discontinued upon such terms and conditions as he may deem just and reasonable."

In a case of this kind, when the master does not appear to have had the slightest connection with the violation of the law, it is certainly not a pleasant duty for a court to visit upon him the penal consequences of other's acts in which he was not a participator. To use the language of a very great judge, Story: "But I cannot bend the rules of law to cases of individual hardship; my duty leads me through a harsh and narrow path; but I have the consolation of knowing that another avenue is open to a department which has the power to temper the severity of the law, and yield relief to innocent sufferers." An appeal I may say that is always received with favor, and according to my experience never made in vain by the innocent.

Another reason for a new trial, is presented by the master of an entirely different nature, simply a question of pleading and evidence, coming out of the allegation contained in the declaration. There is but one count, and that, after setting forth the number of the cigars and the quantity of liquor, proceeds with the averment that "they then and there belonged and were consigned to the master of said ship," and in the conclusion, the allegation is, "whereby the said defendant forfeited and became liable to pay a sum equal to the value of the said goods belonging and consigned to the master thereof."

It is contended by the district attorney, that under the facts in the case, the master may be deemed the consignee of these articles, as in the case of U. S. v. Ten Thousand Cigars [Case No. 16,450]. In that case, the master took the cigars on board without any bill of lading or invoice, with an intention to smuggle or enter them as he might elect. They were, under the entire possession and control of the master, and were on board with his knowledge and assent; the master under these facts was certainly the consignee; but in the present case the facts are very different; the master had no knowledge that any of these goods were on board, but the owner was in charge of them, and they were brought on board by him, and during all the time remained in his possession and custody; I therefore cannot consider the master as consignee of the goods in question.

The allegation in the count, being that the master was owner or consignee of the goods, and the proof not sustaining, but on the contrary negativing this fact at the trial, the counsel of the defendant claimed that this averment was material, and that it was incumbent on the government to prove it, and not being proved, there was a material variance.

The force of this objection was apparent to, and acknowledged by the court at the trial, and with hesitation the jury were instructed that if the other facts required to render the defendant accountable were established, they might consider this averment as surplusage. On further reflection and an examination of the authorities, the opinion I entertained and expressed at the trial is corroborated, and the ruling cannot be sustained. The allegation of ownership, as it is set forth in the writ, becomes a material part of the description of the property; it identifies the property, and it is only that

particular property thus identified and made certain, which the defendant is to be held accountable for. It is quite similar to the case of Com. v. Wade, 17 Pick. 399, where the defendant was indicted for setting fire to the barn of N. and G. whereby the house of D. was burnt. It was shown that G. had no interest in the barn, and the court says: "Then the question arises, whether the allegation may not be rejected as surplusage. Whether it be necessary to state the name of the owner of a building set on fire by which a dwelling house is burnt, we do not determine; but an allegation of such ownership being here inserted, we think it material, and not surplusage. It constitutes a part of the description of the offence, and must therefore be proved." See, also, State v. Weeks, 30 Me. 182; 1 Greenl. Ev. § 65.

The rule being well established that matter of description must be literally proved, and the district attorney having as a part of the description and identification of the property alleged it to belong and be consigned to the master, he was bound to prove that averment, and not having done so, for that reason,.

Verdict set aside; new trial ordered.