## THE IVOR HEATH.

(District Court, E. D. Virginia. July, 1921.)

Customs duties ⬅️122—Ship liable for penalty for bringing in smoking opium not shown on manifest; absence of intent being no defense.

Under Act Jan. 17, 1914, § 8 (Comp. St. § 8801f), providing that, "whenever opium or cocaine, or any preparations or derivatives thereof, shall be found upon any vessel arriving at any port of the United States which is not shown upon the vessel's manifest, * * * such vessel shall be liable for the penalty prescribed" by Rev. St. § 2809 (Comp. St. § 5506), which subjects the master of a vessel from a foreign port which shall bring in any merchandise not shown in its manifest to a penalty equal to the value of such merchandise, a vessel is liable for the penalty prescribed for bringing in smoking opium not shown on its manifest, though importation of smoking opium is prohibited, and though the opium was smuggled in by Chinese members of the crew without the knowledge of the master or any of the officers; the absence of intent being no defense.

In Admiralty. Libel by the United States against the steamship Ivor Heath. Decree for libelant.

Paul W. Kear, U. S. Atty., of Norfolk, Va., and H. H. Rumble, U. S. Admiralty Counsel, of Norfolk, Va., for the United States.

Hughes, Little & Seawell, of Norfolk, Va. (L. T. Seawell, of Norfolk, Va., of counsel), for respondent.

GRONER, District Judge. The Ivor Heath, a British steamship, arrived at the port of Norfolk, on the 23d of November, 1920, from Rotterdam, Holland. Her arrival at Norfolk was the conclusion of a round trip voyage from New York, from whence she sailed in the late summer of 1920, and from which port her crew were shipped. On arrival at Rotterdam the ship was moored to her dock and discharged a cargo of coal; she remained there 7 days, during which time her crew were given shore liberty as often as their duties permitted. The dock at which her cargo was discharged was inclosed with a high fence on the land side and with an entrance by a small gate, at which was a watchman, whose duties appear to have been to allow passage through the gate only to persons entitled to leave or enter the wharf. While

the ship was at Rotterdam, a number of Chinese, members of the crew, without the knowledge of the master of the vessel, brought aboard a large quantity of opium, amounting to 560 tins, each tin being approximately 4"x6", and valued, as stipulated between the parties, at $16,380. The majority of the tins of opium were inclosed in packages, containing approximately a dozen tins each, wrapped in stout paper and tied with string. On the arrival of the vessel in Norfolk, the crew, in accordance with their contract, were paid off and discharged, and the opium was discovered in their baggage as they attempted to land at one of the harbor piers. The presence of the opium on the ship was not shown on the manifest, and upon ascertainment of this fact the collector of the port of Norfolk imposed on the vessel and her master the penalty provided by law, and the libel in this proceeding is brought to enforce the collection of the fine of $16,380 so imposed.

There is, of course, no question in the case that the master or any of the officers of the ship had any knowledge of the presence of opium on board. It is equally true that, while the vessel was at Rotterdam, an officer was on watch whose duty, presumably, was to see that nothing was brought aboard the ship, except in the regular course. It is likewise true that on arrival at this port, and before the crew were paid off, the immigration officials came aboard and examined the crew, for the purpose of determining whether they were suffering from disease or other thing barring them, or any of them, from entering the country as seamen. It does not appear, however, that beyond the ordinary ship inspection any search was made of the baggage or personal effects of the crew, or that any search of their quarters was made to determine whether they were in possession of contraband. Doubtless the inconvenience of such course, and perhaps, too, the difficulty of retaining a crew under such circumstances, made such a search undesirable. However that may be, the fact remains that some six or eight members of the crew were enabled to bring aboard the vessel several trunks full of the prohibited drug, to conceal the same during the passage, and to bring it unmolested over the side of the ship into a small boat hired by them for the purpose of putting themselves and their baggage ashore.

Section 8 of the Act of February 9, 1909, commonly known as the Opium Act (35 Stat. 614), as amended by the Act of January 17, 1914 (38 Stat. 275 [Comp. St. § 8801f]), provides as follows:

"That whenever opium or cocaine, or any preparations or derivatives thereof, shall be found upon any vessel arriving in any port of the United States which is not shown upon the vessel's manifest, as is provided by sections 2806 and 2807 of the Revised Statutes, such vessel shall be liable for the penalty and forfeiture prescribed in section 2809 of the Revised Statutes."

Section 2806 (Comp. St. § 5503), referred to in the preceding quotation, provides that no merchandise shall be brought into the United States from any foreign port, unless the master of the vessel has on board a manifest in writing. Section 2807 (Comp. St. § 5504) provides the character of the manifest and what it shall contain, and section 2809 (section 5506) provides that—

"If any merchandise is brought into the United States on any vessel whatever from any foreign port without having such a manifest on board, or which shall not be included or described in the manifest," etc., "the master shall be liable to a penalty equal to the value of such merchandise not included in such manifest; and all such merchandise not included in the manifest belonging or consigned to the master, mate, officers, or crew of such vessel, shall be forfeited."

The forfeiture in this case was exacted and the guilty members of the crew prosecuted and punished.

It is insisted now on behalf of the vessel that, since the element of intent to violate the law on the part of the responsible officers of the vessel did not exist, the statute does not apply and the penalty should not be enforced. It is likewise insisted that the opium confiscated, being what is generally known as smoking opium, is neither a preparation nor derivative of opium, and therefore not within the terms of the statute; and it is still further contended that in no event is it merchandise within the provisions of section 2809. In support of these several positions, save the first, the case of United States v. Sischo (D. C.) 262 Fed. 1001, is cited, and if it should be held to be controlling would be conclusive of this case; but, although I have fully considered the carefully prepared opinion of Judge Cushman in that case, I am unable to agree either with the reasoning or with the conclusion at which he arrives. To say that smoking opium, because sometimes manufactured out of the ashes of opium that has been smoked, is not a preparation or derivative of opium, is manifestly so incorrect as to require no more than the mere statement of the proposition to refute it, and in my opinion it is equally plain that the tins of opium brought into the country on the Ivor Heath, as shown by the evidence, were "merchandise," within the meaning of the statute, and were required, just as any other merchandise, to be included in the manifest, even though that fact would not have entitled it to be brought in.

It is conceded that the opium was brought in from a foreign port; it is also conceded that no mention of its presence aboard the vessel was contained in the manifest. To say that, because its importation is prohibited by law, it loses its substance and character and is not merchandise is incorrect. It was property, and subject to use and ownership. While it is true that opium prepared for smoking purposes is prohibited entrance into the United States, it is also true that Congress, by the imposition of a tax on the domestic product or the product manufactured in this country, has recognized the domestic article as property. In the case of United States v. Jin Fuey Moy, 241 U. S. 394, at page 401, 36 Sup. Ct. 658, 659 (60 L. Ed. 1061, Ann. Cas. 1917D, 854), which was a prosecution under the Harrison Act, the Supreme Court says:

"If we could know judicially that no opium is produced in the United States, the difficulties in this case would be less; but we hardly are warranted in that assumption, when the act itself purports to deal with those who produce it. * * * Congress, at all events, contemplated production in the United States, and therefore the act must be construed on the hypothesis that it takes place. If opium is produced in any of the states, obviously

the gravest question of power would be raised by an attempt of Congress to make possession of such opium a crime."

The two last-named defenses must therefore be set aside. As to the first defense of absence of intent, it is enough to say that, while it may be a hardship to impose upon the owners of the vessel property a liability, often severe in its terms, for unlawful acts of which neither the owner nor his representative is guilty, it is equally true that it is sometimes necessary, in order to prevent the violation of police or health statutes by the evil-minded through the instrumentalities of the innocent. Recognition of such hardship as is now complained of doubtless impelled the action of Congress in the passage of the Act of June 22, 1874 (18 Stat. 186), which provided that in all actions, suits, and proceedings to collect penalties against vessels for violation of acts similar to those here in question, it should be necessary to show affirmatively that the acts were done with the actual intention to defraud the United States, and while this statute was in effect the courts held the evil intent of the master of the vessel a necessary and an essential element to conviction; but this act of 1874 was repealed by the Act of June 10, 1890 (26 Stat. 141), and its repeal is confirmatory of the fact that experience had shown its ineffectiveness to extend grace, and at the same time prevent smuggling, and by its repeal the law, so far as the good faith of the master of the vessel is concerned, was left as before its passage. In the case of The Queen, 27 Fed. Cas. 672, No. 16,108, which was decided before the passage of the act making the intent an essential element in the prosecution, it was held that the fact that the master did not know that the nonmanifested goods were on board was not enough to exempt the vessel from liability. "If it were to be so held," said Judge Woodruff, "the door to smuggling would be opened so wide that these statutes would be a dead letter."

So in the case of The Helvetia, 11 Fed. Cas. 1061, No. 6345, the evidence showed that the master of the vessel had no knowledge or information at any time that the nonmanifested goods were on the vessel, and that he took all precautions in his power to prevent smuggling, a stronger statement of facts than exists in the instant case; but even those circumstances were held not sufficient to take the case out of the rule or to justify an avoidance of the penalty. See, also, U. S. v. Hutchinson, 26 Fed. Cas. 446, No. 15,431; U. S. v. Missouri, 26 Fed. Cas. 1273, No. 15,785. In view of what has been said above, it seems to me that the statute makes no qualification; it declares that whenever opium, etc., shall be found upon any vessel arriving in any port of the United States which is not upon the manifest, the vessel or the master shall be liable for the penalty. The passage by Congress of the remedial statute, if it may be so designated, making necessary proof of knowledge and intent on the part of the master, and the subsequent repeal of this statute as above adverted to, conclusively show the legislative intent, and leave to the court no other option than enforcement of the law. Congress has not, however, shut the door to the remission of penalties thus incurred to those who are the innocent victims of the evil machinations of others. Section 5292 of the Revised Statutes (3

Fed. Stat. Ann. [2d Ed.] p. 332; Comp. St. § 10130) provides a method by which under such circumstances they may assert their innocence of wrong intent and appeal for remission of the fine.

In this case the presence on board the vessel of a large number of Chinese, known to be addicted personally to the use of smoking opium, should have put the master of the vessel on notice to be vigilant that the law was obeyed. Something more than was done might have been done in an effort to avoid the difficulties which subsequently ensued, and this is said with a full appreciation of all the rights which the law throws around the individual to be protected in his person and from improper search. Recognizing, however, the difficulties I have pointed out above, and recognizing also that the master of the vessel gave warning to the only member of the Chinese crew who was able to speak English that no smuggling would be allowed, that a guard was kept at the entrance to the wharf at which the vessel was moored, and that a watchman was kept on deck to prevent what unfortunately he failed to do, make this a case in which, perhaps, it would not be improper to invoke the act last above recited; but in the proceeding now before the court no other course is proper than to enforce the penalty, and a decree to that effect will be entered upon presentation.