### THE IVER HEATH.

(Circuit Court of Appeals, Fourth Circuit. May 15, 1923.)

No. 1931.

Customs duties ⬅129—Ship liable to penalty for bringing in opium not entered on manifest, irrespective of master's knowledge of unmanifested articles.

Rev. St. 2809 (Comp. St. § 5506), requires the manifesting of goods the importation of which is forbidden by law, such as opium, and where a ship brought into the United States opium not manifested, being concealed in personal baggage of Chinese members of the crew, the ship was liable to a penalty for the value of the opium, irrespective of the master's knowledge of the unmanifested articles.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., and D. Lawrence Groner, Judges.

Libel by the United States against the steamship Iver Heath. From a decree for the United States (275 Fed. 67), George Green, as master and claimant of the steamship, appeals. Affirmed.

Leon T. Seawell, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellant.

H. H. Rumble, Sp. Asst. in Admiralty to U. S. Atty., of Norfolk, Va. (Paul W. Kear, U. S. Atty., of Norfolk, Va., on the brief), for the United States.

Before KNAPP and WOODS, Circuit Judges, and ROSE, then District Judge.

ROSE, Circuit Judge. In this case the customs authorities at the port of Norfolk assessed upon the British steamship Iver Heath a penalty of $16,380, the value of 560 tins of opium brought into this country by the ship and not entered on its manifest. Almost all the opium was found in the personal baggage of six Chinamen, who had, until a few minutes before landing, been members of the ship's crew. They had on the day of the seizure been paid off and discharged. They

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

came ashore at Lambert's Point, bringing with them eight sea bags, two suit cases, and one trunk. They had with them an order, signed by the officer of the ship, to pass them with their personal baggage. The sea bags were each about two feet in diameter and four feet high. The launch was met as usual at the pier by an inspector of the customs, whose duty it was to examine the luggage. Only two of the bags were unlocked. The inspector asked for the keys to the others. He was told that two of the Chinese crew who were expected to come on the launch had landed at Newport News, and they had the keys with them. He held the baggage, and told the Chinamen to get the keys from their shipmates. They left and never voluntarily came back. The customs authorities opened the bags and other receptacles, and found that all they contained other than the tins of opium, were some blankets and quilts by which the tins for better concealment, were covered. Most of the cans were wrapped in stout paper, about a dozen tins to a bundle. A number of the Chinese members of the crew were subsequently apprehended. Some of them pleaded guilty and were given jail sentences.

A search apparently showed that all of the opium that had been brought on the ship had been carried ashore, although one empty opium tin was found on board. Each of the tins were about four inches by six inches, so that the aggregate bulk, as well as the value, of the lot was considerable. The ship's crew consisted of 62 Chinamen and 13 white men; the latter mostly, if not altogether, officers. The ship had come from Rotterdam. It there had a watchman to see who and what came on board, but no examination was made of the personal baggage of the Chinese crew, nor were their quarters inspected, otherwise than to insure that they were kept in a cleanly condition. There is nothing in the evidence to show that the master had any knowledge of the presence of the opium on board, and much to suggest that he had none. The learned judge below nevertheless, held him liable, being of the opinion that under the provisions of section 24 of the Act of March 2, 1799, now section 2809 of the Revised Statutes (Comp. Stat. § 5506), the master was answerable, irrespective of what he knew or did not know about the unmanifested articles.

It was more than 15 months ago when the case was here argued. The Circuit Court of Appeals for the Ninth Circuit had a year earlier, in U. S. v. Sischo, 270 Fed. 958, held that the act did not require the manifesting of goods, the importation of which was forbidden by law, as is, of course, the case with the opium. The Supreme Court had at the instance of the government granted certiorari. As the appellant in the instant case was earnestly making the same contention that had prevailed on the Pacific Coast, it was deemed best to withhold any decision until the Supreme Court had settled that much of the case. This has now been done in U. S. v. Sischo, 43 Sup. Ct. 511, 67 L. Ed. ——, the opinion in which was handed down on the 7th of this month. The judgment of the Circuit Court of Appeals for the Ninth Circuit was there reversed, and it was held that the provisions of section 2809 were applicable to smoking opium.

The only other contention of the appellant is that neither he nor the

ship is liable; it not appearing that he had any knowledge that there was any opium on board. He cites a number of cases in support of his contention. In most of them, the judges emphasize their dislike to imposing penalties, except as a punishment for proved personal default, but otherwise few of them are in point. Thus in U. S. v. Certain Cigars, Fed. Cas. No. 14,765, the charge was that the ship had no manifest aboard. It was proved that the manifest had been lost or mislaid without fraud or collusion, and that no part of the unmanifested cargo had been unshipped. No penalty was incurred under the express provisions of what is now section 2810, R. S. (Comp. Stat. § 5507).

Section 16 of the Act of June 22, 1874, 18 Stat. 189, in so many words provided that no fine, penalty, or forfeiture shall be imposed under the customs revenue law unless intent to defraud shall be found. It was while this enactment, since repealed by the Customs Administrative Act of 1890 (26 Stat. 131), was in force, that the cases of U. S. v. Three Trunks (D. C.) 8 Fed. 583, and U. S. v. Lot of Silk Umbrellas (C. C.) 12 Fed. 412, arose. They were governed by it. In U. S. v. The Walla Walla (D. C.) 44 Fed. 796, the ship was a common carrier, and under the act of 1881 (21 Stat. 322 [Comp. Stat. § 5766]), it was not subject to forfeiture unless the owner or master was a consenting party thereto. The Margaret Yates, 26 Fed. Cas. 1159, No. 15,720 went off largely upon a point of pleading and in The General Cushman, 10 Fed. Cas. 888, No. 5,646, there was involved a section of the Act of March 2, 1799, other than that with which we are now concerned, but the general reasoning of both these cases was against the present position of the government.

The Stafford, 27 Fed. Cas. 1284, No. 16,372, is the only authority at once directly in point and squarely sustaining the position of the appellant. On the other hand, in U. S. v. Hutchinson, 26 Fed. Cas. 446, No. 15,431, the whole subject is reviewed with great industry and ability by Judge Fox, of the District of Maine. He held the master liable in spite of the fact that he knew nothing of the offending. Afterwards Mr. Justice Blatchford came to the same conclusion in The Helvetia, 11 Fed. Cas. 1061, No. 6,345, as in substance did Circuit Judge Woodruff in The Missouri, 26 Fed. Cas. 1273, No. 15,785, and in The Queen, 27 Fed. Cas. 672, No. 16,108. The practical reasons for holding the master to an unqualified liability are clearly and forcibly stated in U. S. v. Hutchinson, supra. If it were otherwise, anything like a general enforcement of the statute would be out of the question. For similar reasons, the lack of conscious participation is no defense under the Food and Drugs Act (Comp. St. §§ 8817–8728).

That much can be said on either side of the question upon which we are now called upon to pass is demonstrated by the wide differences among the many judges who have considered it. The weight of the argument is, however, with those who hold the liability to be unqualified. The repeal, after 16 years of trial, of the act of 1874, before mentioned, somewhat more than suggests that practical experience convinced Congress that the customs laws could not be enforced if penalties were not to be inflicted unless intent to defraud was established.

The legislative exemption of vessels used as common carriers from seizure or forfeiture for violations of the customs laws, unless the master or owner had part therein or knowledge thereof, would appear to demonstrate that Congress supposed that the law had been otherwise, and wished it to remain so, except as to ships so used.

Finding no error in the decree below, it is affirmed.

KNAPP, Circuit Judge, who took part in the hearing of this case, died before the opinion was announced.