## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 09 2017, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS
DEONTA ANDERSON, KORJONTA ANDERSON, AND BEONICA JOHNSON-GRANT

Steven C. Smith
Anderson, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

$3,941 in US Currency,

*Appellant-Defendant,*

and,

Deonta Anderson, Korjonta Anderson, and Beonica Johnson-Grant,

*Appellants-Interested Parties,*

v.

Rodney Cummings, Prosecuting Attorney for the 50th Judicial Circuit for the State of Indiana,

*Appellees-Plaintiffs.*

June 9, 2017

Court of Appeals Case No.
48A02-1607-MI-1564

Appeal from the Madison Circuit Court.
The Honorable David A. Happe, Judge.
Trial Court Cause No.
48C04-1509-MI-1003

**Friedlander, Senior Judge**

[1] Deonta Anderson, Korjonta Anderson, and Beonica Johnson-Grant[1] (Deonta and Korjonta's mother) appeal from the trial court's judgment granting the State's complaint for civil forfeiture of money seized from Deonta after his arrest. We affirm.

[2] On September 22, 2015, Iahjhay Cloyd and Deonta were at Vanity Branson's house where they smoked marijuana. Later that evening, Deonta and Cloyd left Branson's home an unknown number of times, and each time they left, Deonta took a gun along with him. They slept at Branson's house—Cloyd in the living room while Deonta stayed in Branson's room, leaving the gun on the floor.

[3] The next morning, Deonta left the house, taking the gun with him. Officers had received a tip regarding the possible location of a stolen police tactical bag containing a rifle, over a hundred rounds of ammunition, a ballistic vest, a ballistic helmet, and other tactical gear used by police. Two officers with the Anderson City Police Department were conducting surveillance on Branson's home based on that tip. They observed Branson leave and return to the apartment. As she was leaving her apartment for the second time, she was passed by a vehicle occupied by Deonta and Cloyd. After they parked the car and went inside the apartment, Branson parked her car and went inside.

---

[1] Beonica participated in the trial court proceedings because she was Deonta and Korjonta's mother and guardian, but did not technically qualify as an interested party having no personal claim to the money.

[4]     About ten to fifteen minutes later, the officers knocked on the door asking if Malachi Braxton was inside. During the nearly ten to fifteen minutes between the time the officers started knocking on the door and when Branson finally answered, she saw Cloyd holding a plastic bag with a white, powdery substance inside in plain view of anyone in the house. Cloyd also asked Branson if she would secrete the bags to hide the drugs. Branson declined and answered the door. As she walked to the door, Cloyd was standing in the hallway with a bag containing a clump of white powder, and Deonta was in the back room.

[5]     When Branson opened the door, the officers smelled a very strong odor of burnt marijuana coming from inside the apartment. They then began investigating possible drug use and placed Branson in custody. Cloyd, who was agitated and belligerent, walked toward the officers, who then placed him in custody. During a search, officers discovered a small, black digital scale with white powder on it in the front pocket of Cloyd's pants. Branson told officers that Deonta was also in the house. Because the officers were concerned there might be a stolen rifle inside the house, they ordered Deonta to slowly crawl out of the back room so officers could see his hands. After Deonta had done so, officers placed him in custody.

[6]     Officers obtained a warrant to search Branson's house for the stolen rifle, drugs or paraphernalia, or any currency that might be found. After executing the warrant, officers found a gun tucked between the mattress and box spring of the bed in the room where Branson and Deonta slept. Before officers said anything about this discovery, Deonta volunteered that Branson had a handgun permit.

In a shoebox in Branson's closet, they discovered two plastic bags with a white, hardened rock substance in each. One bag contained one clump of the white substance, and the second bag contained nineteen individually wrapped plastic bags all about the same size and shape. Subsequent testing revealed that the white substance was cocaine.

[7] When Deonta was searched, officers found cash in his front pocket. He was transported to the police station and placed in an interview room. Another more thorough search of Deonta led to the discovery of more cash hidden in his underwear and stuffed inside the rolled cuff at the bottom of his sweatpants. In sum, Deonta was carrying roughly $3,900. He was placed under arrest on three outstanding warrants.

[8] The State filed a complaint for civil forfeiture, stating that the $3,941 seized from Deonta was "intended for use in the course of, derived from, or realized through" Deonta's corrupt enterprise and pattern of racketeering activity—dealing in cocaine. Appellants' App. p. 7. The trial court initially granted a default judgment against Deonta, but the judgment was later vacated once Deonta filed a response and sought return of the seized cash. Deonta, by counsel, filed an appearance and answer. The State filed a motion for contempt due to a breakdown in the discovery process. Deonta appeared with counsel at the hearing and testified so the State could obtain the outstanding discovery responses from him. Deonta testified that the money confiscated from him belonged to his brother, Korjonta, who had given him the money to buy a car

for him since at that time Korjonta was a minor. The trial court did not find Deonta to be in contempt and the matter was scheduled for a bench trial.

[9] At the bench trial, Deonta, Korjonta, and Beonica each appeared. After Korjonta entered his appearance, the trial court dismissed the default judgment entered against him. Korjonta and Beonica testified that the cash seized from Deonta was part of the proceeds from a settlement reached in early 2014 after Korjonta's automobile accident. Of his $10,000 portion of the settlement, Korjonta claimed that he had saved $5,000, which was hidden at home, and, just before Deonta's arrest, had given the other $5,000 to his mother to give to Deonta for the purchase of a car. He stated that the price of the car was $5,200.

[10] Beonica testified that she had given $3,941 of the settlement money to Deonta just days before his arrest in late September 2015 to use to purchase a car for Korjonta. She claimed that she had an additional $1,500 set aside for the purchase. Her testimony on cross-examination about the family's income and expenditures reflected a negative cash flow. She also testified that she spent approximately $1,000 of the settlement money on a shopping spree for Korjonta after they received the funds.

[11] The trial court issued an order granting the State's forfeiture complaint for $3,941 in U.S. currency. The trial court then issued an amended order stating that the amount of money seized and forfeited was $3,911 in U.S. currency. Deonta, Korjonta, and Beonica filed a motion to correct error, taking issue with the trial court's statement that the three had been served with process at least

twenty days before the entry of final judgment. They also claimed that there was insufficient evidence to show a link between the money seized and a pattern of racketeering activity. The trial court denied the motion and this appeal followed.

[12] As an initial matter, Deonta, Korjonta, and Beonica appeared at the contempt hearing, which was converted to a discovery hearing, and at the bench trial with their attorney,[2] presenting their evidence. For the first time, in his motion to correct error, and now again on appeal, Deonta complains of the trial court's finding that service of process was made more than twenty days prior to the entry of judgment, claiming that the finding is inaccurate. When a party fails to notify the court of such a defect, the issue is waived, especially when a party participates in the proceeding, complaining only after an adverse result is reached. *Enderle v. Sharman*, 422 N.E.2d 686 (Ind. Ct. App. 1981).

[13] Deonta, Korjonta, and Beonica challenge the sufficiency of the evidence supporting the order, claiming that the State failed to prove that the seized money was used as part of a pattern of racketeering activity. The State was required to prove its case by a preponderance of the evidence. Ind. Code § 34-24-1-4(a) (2002). On appellate review, we consider the evidence most favorable to the judgment along with reasonable inferences, neither reweighing evidence

---

[2] An appearance was filed for Deonta and Korjonta, named interested parties. When Beonica testified, counsel lodged objections and asserted privileges on her behalf.

nor reassessing the credibility of witnesses. *$100 and a Black Cadillac v. State*, 822 N.E.2d 1001 (Ind. Ct. App. 2005), *trans. denied*.

[14] The forfeiture statute provides that the county prosecutor of the county in which property is located can bring a forfeiture action of any property used in the course of, intended for use in the course of, derived from, or realized through corrupt business influence or other misconduct. Ind. Code § 34-24-2-2 (2005). The statutory definition of corrupt business influence refers to a person employed by or associated with an enterprise and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity. Ind. Code § 35-45-6-2(3) (2014). Racketeering activity[3] includes the commission of, or attempt to commit, to conspire to commit a violation of, or aiding and abetting in a violation of any number of crimes including dealing in or manufacturing cocaine or a narcotic drug,[4] and dealing in a schedule I, II, or III controlled substance.[5] Cocaine is a schedule II controlled substance.[6] Indiana Code section 35-45-6-1(d) defines pattern of racketeering activity as occurring when one engages in at least two incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that

---

[3] Ind. Code § 35-45-6-1(e)(28),(30) (2014).

[4] Ind. Code § 35-48-4-1 (2014).

[5] Ind. Code § 35-48-4-2 (2014).

[6] Ind. Code § 35-48-2-6(b)(4) (2013).

are otherwise interrelated by distinguishing characteristics that are not isolated incidents.

[15] The record reflects that the State proved by a preponderance of the evidence that Deonta participated in a pattern of racketeering activity by aiding and abetting or conspiring in dealing in cocaine or dealing in a schedule II controlled substance. Deonta was in possession of nearly $4,000, which was in different denominations than that described by Korjonta and Beonica. Instead of being wrapped together and secured by a band as Korjonta testified, some of the money was found in Deonta's front pocket, some in his underwear, and the rest was found in a cuff of his sweatpants.

[16] Branson, the owner of the house, testified that Deonta and Cloyd left and returned to the house numerous times during the evening before their arrest. Each time Deonta left, he took a gun with him. When they returned for the final time that evening, Deonta slept in Branson's room, leaving the gun on the floor of the bedroom.

[17] The next morning, officers who were conducting surveillance of Branson's home, observed Branson come and go, and observed Deonta and Cloyd leave and return. As they returned, they gave a hand signal to Branson, who was about to leave the house again. The three then went inside. Fifteen minutes after officers knocked on the door of the house, Branson answered the door. Deonta was in the back room and Cloyd was near the front of the house.

Before opening the door, Branson observed Cloyd carrying, in plain view of anyone in the house, a bag containing a white, rock-like substance.

[18] When officers placed Deonta in custody, they discovered some of the money. When they placed Cloyd in custody they discovered in his front pocket a small, black, digital scale with a white powdery substance on it. They found the handgun between the mattress and box spring of the bed where Deonta slept. Deonta volunteered, before officers could make a reference to the discovery, that Branson had a permit to carry a handgun. Officers also found in Branson's room, hidden in a shoe box in a closet, two bags containing what was later determined to be cocaine. One of the bags contained nineteen individually-wrapped bags of cocaine, each about the same size and shape, while the other contained a rock of cocaine. The amount of cocaine found, forty grams, was indicative of the sale of cocaine, not personal use.

[19] Deonta presented his explanation of his possession of the money and attempted to support his claim to the seized funds. Korjonta's and Beonica's testimony differed in several respects, casting doubt on their claim to the money. Further, Beonica's testimony about her income and expenses also called into question Deonta's and Korjonta's claim to the money and their contention that it was not connected to racketeering activity. There was sufficient evidence to support the trial court's judgment.

[20] Next, Deonta, Korjonta, and Beonica present a brief argument that the civil forfeiture action may violate the Excessive Fines Clause of the Eighth

Amendment. We recently discussed the Excessive Fines Clause in the context of civil forfeiture actions in *State v. Timbs*, 62 N.E.3d 472 (Ind. Ct. App. 2016), a case in which transfer was granted and oral argument was heard by the Supreme Court. The Court's decision is pending. Caselaw holds that review of whether a fine or forfeiture is excessive, we must consider if the amount of the forfeiture bears some relationship to the gravity of the offense for which it is designed to punish. *$100*, 822 N.E.2d 1001 (quoting *United States v. Bajakajian*, 524 U. S. 321, 118 S. Ct. 2028, 141 L. Ed. 2d. 314 (1998)). A forfeiture is punitive and violates the clause if it is grossly disproportional to the gravity of the offense. *Id.*

[21] Although the constitutional issue is waived for failure to raise it first at trial, and by failing to support it on appeal with cogent argument, we observe that dealing in cocaine in the amount at issue here would constitute a Level 2 felony. Ind. Code § 35-48-4-1(e) (2014). While conspiring to commit a crime is a separate offense, requiring proof of additional elements, it is a felony of the same level as the underlying felony. *Coleman v. State*, 952 N.E.2d 377 (Ind. Ct. App. 2011); Ind. Code § 35-41-5-2 (2014). Also, one can be charged as a principal if the evidence shows only that the defendant aided or abetted the actual perpetrator. *Coleman*, 952 N.E.2d 377. The fine that could be imposed for a Level 2 felony is set at a maximum of $10,000. Because the amount seized here falls well short of the statutory maximum that could be imposed for the criminal activity, we find that it is not excessive.

[22] Deonta, Korjonta, and Beonica also argue that the forfeited money should have been deposited in the Common School fund. Indiana Code section 34-24-1-4 (d)(2)(D) provides that any excess money seized by the State over law enforcement costs is directed to be transferred to the state treasurer for deposit in the common school fund. The case cited as support for reversal, *Serrano v. State*, 946 N.E.2d 1139 (Ind. 2011), however, observes that the trial court may except law enforcement expenses incurred for the criminal investigation associated with the seizure. *See* Ind. Code § 34-6-2-73 (1998) (law enforcement expenses include costs of criminal investigation associated with seizure, repayment of investigative fund of law enforcement agency making seizure, and expenses of prosecuting attorney for proceedings associated with the seizure and the offenses leading). We find no error in the trial court's distribution of the seized funds.

[23] Judgment affirmed.

Bailey, J., and Robb, J., concur.