# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-40539

United States Court of Appeals
Fifth Circuit

**FILED**

October 16, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

SANDRA HARO,

      Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:16-CR-551-6

Before HIGGINBOTHAM, DENNIS, and COSTA, Circuit Judges.

PER CURIAM:*

Sandra Haro pleaded guilty pursuant to a plea agreement to one count of conspiring to engage in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (h). The district court sentenced Haro to 130 months in prison, followed by three years of supervised release. The district court further imposed a $1.825 million forfeiture money judgment on Haro, including an order to forfeit $13,908 in cash seized from her home upon her arrest. On

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

appeal, Haro brings multiple challenges to her sentence and the district court's money judgment.

## I

Haro, the former common-law spouse of Mexican drug-cartel member Jose Bonilla-Torres (Jose), participated in a conspiracy from 2014 to 2016 to launder Jose's drug proceeds. In early 2014, Haro introduced Jose to Javier Reyna, who owned a trucking business, and thereafter Haro served as a "middle man," working with Reyna to transport Jose's drug proceeds from various locations in the eastern half of the United States to south Texas, which were designated to be smuggled into Mexico and transferred into the possession of drug cartel members.

Roosevelt Faz worked with Reyna to coordinate the transportation by instructing the drivers, Guillermo Trevino, Ted Cantu, and Erwin Contreras, where to pick up the money and then accepting delivery of some of the loads of drug proceeds. Haro helped coordinate the delivery of ten to fifteen loads of Jose's cash to a stash house, which Haro owned and rented to Jose's sister, Maria Bonilla-Torres (Maria). Haro further facilitated communication between Jose and Reyna and between Maria and Reyna. Overall, the conspirators laundered over $2.8 million in drug proceeds during that two-year period.

Haro was arrested in May 2016. In a search of her residence, agents seized $13,908 in cash. Following her arrest, Haro agreed to a recorded interview with police, in which she confessed to her role in the conspiracy. Haro was indicted with conspiracy to commit money laundering of drug proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (h), and subsequently pleaded guilty pursuant to a plea agreement.

The district court held a forfeiture hearing and then issued a preliminary forfeiture order requiring Haro to forfeit $1.735 million. The court also ordered

No. 17-40539

forfeiture of the $13,908 seized from her residence, specifying that it should be credited towards the money judgment.

At sentencing, the district court attributed sixteen money loads listed in Haro's PSR, totaling $2,853,006, to Haro as relevant conduct, resulting in a sixteen-level increase to Haro's base offense level.   Per the PSR's recommendation, the district court also applied a three-level aggravating-role enhancement for being a manager or supervisor under U.S.S.G. § 3B1.1(b). Haro's total offense level and criminal history yielded a Guidelines range of 121 to 151 months of imprisonment, and the district court sentenced Haro to 130 months of imprisonment.   In a final forfeiture order, the court set the personal money judgment at the amount attributable to Haro that had not yet been seized by law enforcement: $1.825 million.  Haro appeals.

## II

### A. Challenges to the Sentence

Haro first challenges her sentence of 130 months imprisonment. She claims that the district court clearly erred in determining the amount of laundered funds attributable to her as relevant conduct, and in assigning her a three-point aggravating-role enhancement rather than a minor-role reduction.  She also contends that the district court should have granted her a downward departure or variance based on her family ties and responsibilities.

We review a sentence for reasonableness using a bifurcated process. *Gall v. United States*, 552 U.S. 38, 49–51 (2007).   First, we ensure there was no significant procedural error, including improperly calculating the Guidelines range.  *Id.* at 51. Next, we review the substantive reasonableness of the sentence for abuse of discretion.  *United States v. Scott*, 654 F.3d 552, 555 (5th Cir. 2011).   We review a sentencing court's interpretation of the Guidelines de novo and its findings of fact for clear error.  *See United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007).  "A factual finding is not clearly

3

No. 17-40539

erroneous if it is plausible in light of the record read as a whole." *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994).

### 1. Relevant conduct

The district court determined the laundered amount to be more than $1.5 million, but less than $3.5 million, resulting in a sixteen-point increase in Haro's offense level. *See* U.S.S.G. § 2B1.1(b)(1). Haro argues that the district court clearly erred when calculating the total amount of laundered money attributable to her as relevant conduct, arguing that she should have been held responsible only for the amount seized from the stash house in March 2016.

Calculation of total laundered funds is a factual finding reviewed only for clear error. *United States v. Fernandez*, 559 F.3d 303, 319–20 (5th Cir. 2009). "The court need only make a reasonable estimate of the loss[,] (in other words, the amount laundered)." *Id.* at 623 (cleaned up). Under the relevant-conduct provision of the Guidelines, a defendant is responsible for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A) (2016). In the case of a jointly undertaken criminal activity, a defendant is also responsible for the acts and omissions of others, if such acts were "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal activity," "reasonably foreseeable in connection with that criminal activity" and, as relevant here, "occurred during the commission of the offense." U.S.S.G. § 1B1.3(a)(1)(B).

#### a

The district court attributed $175,000 to Haro based on recorded telephone conversations between Haro, Reyna, and Maria in October 2015, discussing a delivery of cash in that amount to the stash house. The district court also attributed to Haro $157,800 seized by officers during a search of the stash house in March 2016. Haro argues that the district court erred by

4

attributing to her both the October 2015 load and the March 2016 seized amount, contending that the seized amount from March was simply what remained of amounts discussed the previous October. She points out that there were no seizures from the stash house before March 2016, and asserts that there is no evidence that the money was otherwise taken from there between October 2015 and March 2016.

The district court rejected this argument, noting that, in a recorded conversation between Haro, Reyna, and Maria in which the three discussed the discovery of a $5,000 shortfall in the October 2015 load, Haro stated that she could not say what happened because she had burned the bags. "If the money was still there," the court reasoned, "it'd be easy to say, let me go count the money." The district court further stated, "[F]or this kind of activity, . . . once [the money is] here, it's not sitting here for months on end." Further, in Maria's post-arrest interview, she stated that Reyna would pick up the currency loads delivered to her house within "a few days." Haro does not address the district court's reasoning or the evidence presented by the Government. We find the evidence sufficient to conclude that the district court's finding was not clearly erroneous.

**b**

Haro also challenges the district court's attribution to her of $440,000 seized on February 7, 2015. On that day, Cantu was transporting these drug proceeds to Faz, but was stopped while driving and the money was seized. Cantu instead gave Faz the seizure paperwork.

Haro objects to the inclusion of the $440,000 as relevant conduct, arguing that, under U.S.S.G. § 1B1.3, she could not be held liable for loads she was aware of unless she agreed to assist in laundering them. According to Haro, there is no evidence that she had any involvement in the laundering of the relevant $440,000 load—only that she was told about the seizure afterwards

5

No. 17-40539

and instructed to send a picture of the seizure notice to Jose. She further maintains that there was no evidence that she had even joined the conspiracy by February 2015, the time of the relevant seizure.

The district court did not clearly err in including the $440,000 as relevant conduct. While it is true that Haro could only be held accountable for acts "within the scope of the jointly undertaken criminal activity," U.S.S.G. § 1B1.3(a)(1)(B), the record supports the conclusion that the $440,000 load meets that requirement. In pleading guilty, Haro admitted that she joined the conspiracy in 2014, before the February 2015 seizure. Moreover, Haro's statements in her post-arrest interview suggest that she was expecting the delivery of this particular load, and indeed was exercising a managerial role over it. Because the details of her confession matched the circumstances of the seizure of the $440,000 load on February 7, 2015, we affirm the district court's attribution of the load to Haro.

**c**

Haro next contends that the court erred in attributing to her "$2,080,206 in amounts listed in the presentence report that did not identify her or [Jose] as being involved." This amount consisted of thirteen of the sixteen loads attributed to her by the district court, excluding the three loads already discussed above. Haro maintains that there was no evidence connecting her personally to these loads. She cites U.S.S.G. § 1B1.3, comment. n.4(C)(v),[1] for the proposition that a defendant's mere knowledge of a co-conspirator's illegal

---

[1] U.S.S.G. § 1B1.3, comment. n.4(C)(v), provides the following illustration of conduct outside the scope of jointly undertaken activity:

> Defendant O knows about her boyfriend's ongoing drug-trafficking activity, but agrees to participate on only one occasion by making a delivery for him at his request when he was ill. Defendant O is accountable . . . for the drug quantity involved on that one occasion. Defendant O is not accountable for the other drug sales made by her boyfriend because those sales were not within the scope of her jointly undertaken criminal activity (i.e., the one delivery).

conduct is not sufficient to attribute the conduct to the defendant. Haro's reliance on the Guidelines commentary is misplaced. The commentary discusses a defendant who "knows about her boyfriend's ongoing drug-trafficking activity but agrees to participate on only one occasion" as a favor. By contrast, here, Haro was not merely aware of the illegal drug activity; she actively participated in a two-year conspiracy to launder drug proceeds and confessed to helping "move money" ten to fifteen times. It was therefore not clear error for the district court to include sixteen loads that were seized during Haro's active participation in the conspiracy.

### 2. Aggravating Role Enhancement

In calculating Haro's Guidelines range, the district court applied an enhancement to her base offense level under U.S.S.G. § 3B1.1(b), which prescribes a three-level enhancement where "the defendant was a manager or supervisor" of a criminal activity that "involved five or more participants or was otherwise extensive." A defendant can be a manager or supervisor for purposes of § 3B1.1(b) even if she exercised management responsibility only over the property, assets, or activities of a criminal organization, without overseeing another participant. *United States v. Delgado*, 672 F.3d 320, 345 (5th Cir. 2012) (en banc). The district court's determination that a defendant qualifies as a manager or supervisor under § 3B1.1(b) is a factual finding reviewed for clear error. *See United States v. Cabrera*, 288 F.3d 163, 173 (5th Cir. 2002).

Haro claims that the district court erred in applying the enhancement and argues instead that her role was minor enough to warrant a mitigating role adjustment. She asserts that there was no evidence that she ever communicated with any of the drivers, had authority over others, or physically handled, transported or received any of the transported funds. Instead, she contends that her role was "minimal and incidental" and was limited to

relaying messages between Jose, Reyna, and Maria.  She also notes that she had no proprietary interest in the laundered money, and was paid only small amounts by Jose, illustrating that she was a subordinate rather than a supervisor or manager.

The Government, by contrast, highlights Haro's important role in the conspiracy: she arranged the introduction between Reyna and Jose that initiated the conspiracy to launder Jose's drug proceeds through Reyna's contacts; she facilitated communication between Jose and Reyna and between Reyna and the stash house coordinator, Maria; and she owned the house used as the stash house.  The Government additionally points to a post-arrest statement as further illustrating Haro's managerial role.  According to an agent who testified at the forfeiture hearing, Maria stated that Haro and Reyna were "in charge of the money."  Maria's statement was corroborated by Haro's own admission that she, Reyna, and Jose were all responsible for making up the $5,000 shortfall in one of the loads.

Haro does not address Maria's post-arrest statements that place Haro in a position of authority over the money and portray Haro as Reyna's coequal.  Under *Delgado*, such a role is sufficient to support the enhancement.  *See* 672 F.3d at 345.  Nor does Haro explain why, if she was merely a subordinate with a minimal role in the conspiracy, she would be required to contribute to make up for the $5,000 shortfall.  For these reasons, the district court did not clearly err in finding that Haro was a manager or supervisor for purposes of § 3B1.1.

### 3. Downward Departure or Variance

Haro contends that the district court erred in failing to grant a downward departure based on her family ties and responsibilities.  "We have jurisdiction to review a district court's refusal to grant a downward departure from the Guidelines only if the refusal was based on an error of law."  *United States v. Buck*, 324 F.3d 786, 797 (5th Cir. 2003).  And "[a] refusal to grant a

downward departure is a violation of law only if the court mistakenly assumes that it lacks authority to depart." *United States v. Cooper*, 274 F.3d 230, 248 (5th Cir. 2001) (internal quotation marks omitted) (quoting *United States v. Yanez–Huerta*, 207 F.3d 746, 748 (5th Cir. 2000). Here, Haro makes no argument that the district court mistakenly believed that it lacked the authority to depart, and nothing in the record suggests that the court held that view. Accordingly, we lack jurisdiction to review the district court's decision to deny the departure. *See Cooper*, 274 F.3d at 248.

Haro alternatively contends that the district court erred in failing to grant a downward variance, which amounts to a challenge to the substantive reasonableness of her sentence. This court reviews the substantive reasonableness of the sentence for abuse of discretion. *Scott*, 654 F.3d at 555. The district court sentenced Haro to 130 months of imprisonment, within the Guidelines range of 121 to 151 months. When a district court sentences a defendant within a properly calculated Guidelines range, the sentence is presumptively reasonable. *See United States v. Gutierrez-Hernandez*, 581 F.3d 251, 254 (5th Cir. 2009). "The presumption is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors." *Scott*, 654 F.3d at 555 (internal quotation marks omitted). Haro argues that the district court failed to account for a factor that should have received significant weight: her family ties and responsibilities.

In determining that a Guidelines sentence was warranted, the district court emphasized the seriousness of the offense, noting that Haro had engaged in multiple transactions over an extensive period and that her money-laundering efforts helped perpetuate the drug trade, which in turn caused substantial societal harm. The court also found that Haro participated in the

conspiracy to achieve financial gain, despite the risk to her family if she were caught.  Thus, the district court considered Haro's arguments regarding her family, but concluded that they did not warrant a sentence below the Guidelines range.  Haro does not point to any precedent suggesting that the district court was required to give significant weight to her family-ties argument, let alone that it required a downward variance.  Accordingly, we affirm the district court's sentence.  *See United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015) (noting that our review of the substantive reasonableness of a sentence is highly deferential to the sentencing court, which sits in a better position to find facts and consider the § 3553(a) factors).

## B. Challenges to the Forfeiture Order Imposing a Money Judgment

The district court imposed on Haro a forfeiture order of $1.825 million, holding her jointly and severally liable with several of her coconspirators, and further ordered Haro to forfeit $13,908 in cash seized from her house upon her arrest to be credited toward the total forfeiture amount.[2]  Haro appeals the district court's forfeiture order and money judgment, bringing several challenges to the sufficiency of the evidence to uphold them, the district court's calculation of their amounts, and the constitutionality of the money judgment under the Eighth Amendment.  We address each of her arguments in turn.

### 1. Substitution

The district court relied on 18 U.S.C. § 982's provision for the forfeiture of substitute property to order forfeiture of funds that were not seized by the

---

[2] A court may enter a money judgment establishing the total amount of a defendant's forfeiture liability.  *See United States v. Cessa*, 872 F.3d 267, 273–74 (5th Cir. 2017).  The court's forfeiture order apparently rested on 18 U.S.C. § 982(a)(1), which provides:

The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

Government.    Section 982 permits such substitution when a defendant, through her acts or omissions, has concealed or dissipated forfeitable assets. Section 982(b)(1) states, "The forfeiture of property under this section . . . shall be governed by the provisions of [21 U.S.C. § 853]."   The substitute-asset provisions in 21 U.S.C. § 853(p), in turn, state that if, as a result of any act or omission of the defendant, the tainted property subject to forfeiture "cannot be located upon the exercise of due diligence," "has been placed beyond the jurisdiction of the court," or is otherwise unavailable, "the court shall order the forfeiture of any other property of the defendant, up to the value of" the unavailable, tainted property.    However, § 982(b)(2) qualifies the Government's ability to seek substitute assets from money launderers, stating:

> The substitution of assets provisions of [§ 853(p)] shall not be used to order a defendant to forfeit assets in place of the actual property laundered where such defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period.

Here, the district court expressly found at sentencing that Haro "conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period."   Though Haro conclusorily argues on appeal that there was not sufficient evidence for this finding, she provides no support for her argument.  Accordingly, she has failed to demonstrate that this finding was clear error and therefore the forfeiture of substitute assets under § 982 was proper.

### 2. Calculation

Haro brings three challenges to the amount of the district court's forfeiture order.   First, she conclusorily contends that the amounts are speculative and unsupported by competent evidence, "almost entirely based on

what people who did not package, count, or even see the money thought or claim the amounts were." However, Haro does not explain how the evidence was unreliable, and the district court at sentencing may rely on sources that do not have firsthand knowledge. *See United States v. Nava*, 624 F.3d 226, 230–31 (5th Cir. 2010) ("In making factual findings for sentencing purposes, the district court may consider any evidence 'which bears sufficient indicia of reliability to support its probable accuracy, including hearsay evidence.'" (quoting *United States v. Solis*, 299 F.3d 420, 455 (5th Cir. 2002)).

Second, Haro claims that her $1.825 million money judgment should be reduced by the amount forfeited as part of two of her codefendants' plea agreements. Her claim is meritless: these codefendants agreed to forfeit the $440,000 and $300,206 seized from their vehicles, respectively, and the district court did not include these amounts in calculating Haro's money judgment.

Third, Haro contends that the district court erred in ordering the entire $13,908 seized from her residence on the day of her arrest forfeited, claiming that $7,908 of the $13,908 included child support payments from Jose as well as rent payments from Jose on behalf of Maria, who lived in the stash house owned by Haro. The Government asserts in response that because the rental payments were for the property used as the stash house they were "involved in" the offense. The Government further notes that, although Haro stated that she usually received $300 to $500 as a commission for a laundered load, she also admitted to receiving up to $1800 to $2000 at a time "on a rare occasion" and she never deposited those funds in the bank.

In light of the rental payments' direct link to the stash house that facilitated the money laundering conspiracy, and the large amounts of cash Haro admitted having received for her role in the conspiracy, it was not clear error for the district court to find that the entire $13,908 seized from Haro's home were involved in the offense and thus forfeitable.

No. 17-40539

### 3. Excessive Fine Under the Eighth Amendment

Haro contends that the forfeiture judgment is grossly disproportional to the gravity and scope of her criminal conduct in violation of the Eighth Amendment's prohibition on excessive fines. An in personam, criminal forfeiture is a form of monetary punishment subject to the Eighth Amendment's prohibition against excessive fines.[3] *See Alexander v. United States*, 509 U.S. 544, 558–59 (1993). And the Supreme Court has specifically applied it in the context of in personam forfeiture of currency under § 982(a)(1). *See United States v. Bajakajian*, 524 U.S. 321, 328 (1998).

In *Bajakajian*, the Supreme Court held that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." 524 U.S. at 334. There, the Court concluded that the criminal forfeiture of the entire sum of $357,144 the defendant had failed to report when leaving the United States would be constitutionally excessive. *Id.* at 337. In so concluding, the Court considered the defendant's "minimal level of culpability," the fact that his violation was unrelated to any other illegal activities, that the forfeiture exceeded by "many orders of magnitude" the $5,000 maximum fine provided by the Guidelines, and the minimal level of harm the defendant caused. *See id.* at 338–40.

---

[3] The Government argues that, under *United States v. Betancourt*, 422 F.3d 240 (5th Cir. 2005), the Excessive Fines Clause of the Eighth Amendment does not apply to forfeiture of the corpus of the crime, especially when it also constitutes drug proceeds. However, *Betancourt* stands for the proposition that forfeiture of the proceeds (or the fruits) of unlawful conduct is not a punishment subject to the Eighth Amendment. *See* 422 F.3d at 250 (citing *United States v. Alexander,* 32 F.3d 1231, 1236 (8th Cir. 1994) ("Forfeiture of proceeds cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity.")). The forfeiture order in this case, however, was not limited to proceeds of the unlawful activity but instead included the laundered funds themselves (the corpus). An in personam, criminal forfeiture of the corpus is punitive and therefore subject to the Excessive Fines Clause. *Alexander*, 509 U.S. at 558–59; *Bajakajian*, 524 U.S. at 328.

No. 17-40539

Haro maintains that the $1.825 million forfeiture order here is excessive under *Bajakajian* because it is more than three times the $500,000 statutory maximum fine and because she lacks the resources to pay the amount of the forfeiture. However, the statutory maximum fine was actually $500,000 or *twice the property involved in the transaction*, *see* § 1956(a)(1)(B)(i), (h), which for Haro would have been well over $3 million based on the district court's estimate of the funds she assisted in laundering. The $1.825 million forfeiture was therefore below the statutory maximum fine and less than six times greater than the recommended Guidelines maximum of $350,000. By contrast, in *Bajakajian*, the forfeiture amount was seventy times the amount of the maximum fine authorized by the Guidelines. *See* 524 U.S. at 340. Moreover, Haro's offense was substantially more serious than the offense at issue in *Bajakajian*. In contrast to the one-time currency reporting offense in *Bajakajian*, Haro participated in a two-year conspiracy to launder drug proceeds. In light of these factors, we conclude that the forfeiture judgment was not constitutionally excessive.[4]

**\*\*\***

For these reasons, we AFFIRM the district court's judgment in full.

---

[4] After the district court entered its forfeiture order, but before Haro filed her opening brief in this Court, the Supreme Court issued its decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). *Honeycutt* involved a forfeiture order under 21 U.S.C. § 853(a)(1), which mandates the forfeiture of "any proceeds the person obtained, directly or indirectly, as the result of a violation of" the drug trafficking laws. The Supreme Court held that "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime" and rejected the lower court's conclusion that a defendant convicted of a drug conspiracy offense may be held jointly and severally liable for the proceeds foreseeably obtained by his coconspirators under that statute. 137 S. Ct. at 1635. Haro did not argue that 18 U.S.C. § 982 only permits the forfeiture of property that she herself acquired as the result of her offense either before the district court or in her opening brief on appeal. Because Haro only addresses this issue in her reply brief, we decline to consider it. *See, e.g., United States v. Aguirre–Villa,* 460 F.3d 681, 683 n.2 (5th Cir. 2006) ("[T]his Court will not ordinarily consider arguments raised for the first time in a reply brief.").